**Walter GOMEZ, Plaintiff,**

v.

**Thomas J. COUGHLIN, Commissioner, Department of Correctional Services of the State of New York, et al., Defendants.**

No. 87 Civ. 5262 (RJW).

United States District Court,
S.D. New York.

April 20, 1988.

Walter Gomez, pro se.

Robert Abrams, Atty. Gen., of the State of N.Y., New York City, for defendants; Stephen M. Jacoby, Asst. Atty. Gen., of counsel.

ROBERT J. WARD, District Judge.

Plaintiff Walter Gomez, an inmate presently incarcerated at Washington Correctional Facility, commenced this *pro se* action under 42 U.S.C. § 1983 and has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. Defendants Commissioner Coughlin, Lieutenant Stow and Sergeant Kiernan have moved for an order dismissing the complaint pursuant to Rules 12(b)(1), (b) (6), (c) and (h), Fed.R.Civ.P. or, alternatively, for summary judgment pursuant to Rule 56, Fed.R.Civ.P. For the reasons that follow, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted.

## BACKGROUND

Plaintiff's lengthy two-part complaint[1] describes a series of events which occurred

---

[1] Although plaintiff indicates in response to an inquiry by defendants that his first complaint is the actual complaint and the second complaint is a memorandum of law, the court in light of plaintiff's *pro se* status will consider the two documents as an integrated whole and will address all potential legal claims raised in both documents.

at Mid–Orange Correctional Facility between March 8, 1987, and March 16, 1987, and ultimately resulted in plaintiff's transfer to another facility. Plaintiff claims that on March 8, 1987, at 10:00 p.m., he had an argument with another inmate that was not serious enough to result in a physical confrontation. At 10:30 p.m., Anthony Rizzo, the living unit correction officer approached him and the other inmate, Eric Rodriquez, to inquire about the confrontation. Both inmates assured Rizzo that the dispute had been worked out. Before Rizzo went off-duty at 12:00 a.m., he left a note with respect to the confrontation for Lieutenant Smith, the correction officer on the subsequent shift. Smith approached plaintiff, who was up reading at 3:00 a.m., and asked him about the confrontation. Smith informed plaintiff that it was his responsibility to decide whether plaintiff and Rodriquez should be separated before he ended his shift to avoid a further confrontation. Smith indicated that Rodriquez had told him that there would not be physical violence and asked plaintiff to express his opinion. Plaintiff then told Smith:

> If I felt that confrontation was necessary and the only alternative, then without hesitation I or we would of [sic] engaged in physical contact but it was certainly not severe nor necessary enough to be taken to that extreme.

Smith indicated that he was satisfied with this explanation and would not separate the two inmates.

On March 9, 1987, at 9:30 a.m., when plaintiff was involved in a drafting project, he was informed that he should immediately report to the Vocational Supervisor's office. When he arrived, he was patted down, handcuffed and strip searched. Plaintiff protested orally and informed the Sergeant supervising the action, defendant Kiernan, that Lieutenant Smith had not found separation necessary. Kiernan informed plaintiff that since plaintiff had problems with other inmates in the population he was not taking any chances with respect to a confrontation breaking out between plaintiff and Rodriquez. Plaintiff was subsequently placed in Involuntary Protective Custody ("IPC") and removed

from his drafting and teacher's aide programs. Plaintiff claims that his placement in IPC was authorized by Lieutenant Stow upon the recommendation of Sergeant Kiernan.

After being placed in IPC, plaintiff on March 9, 1987, received an Involuntary Protective Custody Recommendation which stated the reasons for the IPC placement. This document stated that Sergeant Kiernan had received information that plaintiff had a problem with other inmates in the population and that plaintiff's behavior was erratic. According to plaintiff, this document was not only false (because he had been free of disciplinary action for over a year) but also the only material he had available to prepare his defense.

When plaintiff informed the officer delivering the recommendation that he needed assistance in obtaining witnesses for his defense, the officer told him not to worry about it. Although the officer finally agreed to tell the Lieutenant of plaintiff's request, plaintiff never received any response.

On March 11, 1987, plaintiff had the opportunity to speak with Lieutenant Stow during a security check. He informed Stow that he needed assistance and Stow agreed with him and said that he would see that assistance was assigned to help him prepare a defense. Plaintiff was unable to communicate with anyone except Lieutenant Smith, whom plaintiff asked personally to be a witness. Smith, however, never appeared on plaintiff's behalf and no explanation was given for his failure to appear. No other assistance was given to plaintiff.

On March 12, 1987, a hearing was held before Lieutenant Stow, the individual who had authorized plaintiff's IPC placement. Plaintiff claims that when he arrived in the hearing room, Stow had already filled out the Hearing Determination. Plaintiff interpreted this action as indicating that Stow was not interested in hearing plaintiff's side. Stow permitted plaintiff to make a statement in rebuttal. Plaintiff claims that his statement of defense was in vain because Stow informed him that plaintiff's

comments would not change Stow's decision. Following plaintiff's statement, Stow read plaintiff the determination. The determination was to keep plaintiff in IPC until he could be transferred to another facility. The determination stated that it was based on:

> Reliable information that [plaintiff] threatened another inmate with a weapon, even though the weapon was not found, also that if [plaintiff] had injured the other inmate, other residents in the cottage were going to do [plaintiff] to the point of serious injury or possible termination.

The reason for the determination was "to protect [plaintiff] and to maintain the good order and security of the facility." Plaintiff claims that Stow informed him that he would remain in IPC until he could be transferred to another medium security prison.

On March 16, however, Gomez was transferred to Great Meadow Correctional Facility, a maximum security prison. On March 20, 1987, plaintiff administratively appealed his IPC hearing on the grounds of, *inter alia*, denial of opportunity to present witnesses, predetermination by hearing officer Stow, prior authorization by Stow of plaintiff's IPC, and plaintiff's improper transfer to a maximum security prison. On August 7, 1987, the New York Department of Correctional Services Departmental Review Board reversed the IPC hearing disposition for procedural error.

On September 9, 1987, plaintiff filed a motion for a preliminary injunction pursuant to Rule 65, Fed.R.Civ.P., to transfer him to a medium security facility. The motion was made returnable for September 16, 1987. On September 9, 1987, plaintiff was transferred to Washington Correctional Facility, a medium security facility. Accordingly, the Court denied plaintiff's motion as moot.

While plaintiff was waiting for the completion of administrative review of the IPC hearing determination, he filed on July 23, 1987, a federal complaint alleging that the events described above violated his rights under 42 U.S.C. § 1983. Plaintiff alleges

that his right to due process was violated by a lack of assistance in his defense, the inability to call witnesses, Stow's bias, and his transfer to a maximum security prison. Plaintiff also claims that the process of placing him in IPC and his subsequent transfer to a maximum security facility constituted cruel and unusual punishment, an unreasonable search and seizure, and a double jeopardy violation. Finally, plaintiff contends that the statements made by the defendant Kiernan and Stow were slanderous.

The relief sought by plaintiff includes: 1. an injunction transferring plaintiff to Mid-Orange Correctional Facility; 2. an expungement of all records relating to the incident in question particularly records indicating that plaintiff made threats with respect to a weapon; 3. $2000 in compensatory damages individually from defendants Kiernan and Stow; 4. punitive damages of $500 for slanderous information offered by defendants; and 5. a declaratory judgment that defendants' acts and practices violated plaintiff's constitutional rights.

## DISCUSSION

A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Red.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–250, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues— where those issues are not material to the

claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. United States Fire Ins. Co., supra,* 804 F.2d at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

As noted above, all parties in the instant case have moved or cross-moved for summary judgment. However, cross-motions for summary judgment do not warrant the granting of summary judgment unless the Court finds that "one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Frouge Corp. v. Chase Manhattan Bank,* 426 F.Supp. 794, 796 (S.D.N.Y. 1976). *See also Bank of Am. Nat'l Trust and Sav. Ass'n v. Gillaizeau,* 766 F.2d 709, 716 (2d Cir.1985); *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 313–14 (2d Cir.1981); *Home Ins. Co. v. Aetna Casualty and Surety Co.,* 528 F.2d 1388, 1390 (2d Cir.1976).

Moreover, in ruling on the motions for summary judgment, the Court will liberally construe plaintiff's complaint because he is a *pro se* litigant. *See Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (*per curiam*). When, as here, the plaintiff alleges a violation of his civil rights, the Court must apply this standard with particular strictness. *See Owens v. Hass,* 601 F.2d 1242, 1247 (2d Cir.1979), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). This case is particularly appropriate for summary judgment in that defendants have agreed to accept plaintiff's version of the facts as true for the purposes of the motion.

## I. *The Section 1983 Claim*

To support a claim under section 1983, the complaint must allege that a person acting under color of state law committed acts that deprived the plaintiff of a right, privilege or immunity guaranteed by the Constitution or laws of the United States. 42 U.S.C. § 1983.

### A. *Personal Involvement*

Defendants Coughlin and Kiernan contend that the complaint contains no factual allegations of their personal involvement in plaintiff's placement in IPC and his subsequent transfer to a maximum security facility. It is clear that personal involvement or knowledge of defendants in alleged constitutional deprivations is a prerequisite to an award for damages under section 1983. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). Respondeat superior is not a valid basis for liability under section 1983, *Arroyo v. Schaefer,* 548 F.2d 47, 51 (2d Cir.1977), and cannot be used as a substitute for personal involvement. *See Rizzo v. Goode,* 423 U.S. 362, 375–77, 96 S.Ct. 598, 606–07, 46 L.Ed. 2d 561 (1976); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). However, liability may be imposed on supervisory personnel where there is an affirmative link between the constitutional violation and the adoption of a plan or policy—express or otherwise—showing their authorization or approval of the misconduct at issue. *Rizzo v. Goode, supra,* 423 U.S. at 371, 96 S.Ct. at 604. An individual need not direct a particular action with respect to the aggrieved party, but

rather will be considered to have sufficient personal participation to sustain section 1983 liability if he affirmatively promoted a policy which sanctioned the type of action that caused the violation. *Duchesne v. Sugarman,* 566 F.2d 817, 831 (2d Cir.1977). Moreover, section 1983 can be violated regardless of whether the policy being challenged is one of action or inaction. *Id.* at 832.

■ It is clear from the complaint that Thomas A. Coughlin, III, the Commissioner of the New York State Department of Correctional Services, had no personal involvement in the IPC proceeding at issue and must, therefore, be dismissed as a defendant. Accordingly, the Court grants Coughlin's motion for summary judgment and dismisses the complaint against him.

■ The allegations in the complaint with regard to defendant Kiernan are quite different. Unlike his claims concerning defendant Coughlin, the plaintiff alleges that defendant Kiernan improperly recommended an IPC placement and transfer for plaintiff. The Court believes that plaintiff has alleged a sufficient amount of personal involvement to withstand summary judgment with respect to defendant Kiernan on this ground.

### B. *Due Process of Law*

In essence, plaintiff argues that he was deprived of liberty without due process of law when he was placed in IPC and subsequently transferred to a more secure facility. Specifically, plaintiff asserts his constitutional rights were violated because he was unable to present witnesses at his IPC hearing, he did not have assistance in preparing his defense, and because the hearing officer had authorized his confinement and did not come to the hearing with an open mind.

Before turning to the merits of plaintiff's claim, it is crucial to distinguish between segregation for disciplinary reasons and segregation for administrative purposes. Generally, when an inmate of the New York prison system is confined to segregation for disciplinary reasons, he is deprived of a liberty interest which is protected by

state law. *See Sher v. Coughlin,* 739 F.2d 77, 80 (2d Cir.1984). Under such circumstances, due process entitles the prisoner to certain procedural protections including twenty four hours' advance written notice of the charges against him; a right to call witnesses and present documentary evidence in defense, unless doing so would jeopardize institutional safety or correctional goals; the aid of a staff member or inmate in presenting a defense, provided the inmate is illiterate or the issues are complex; an impartial tribunal; and a written statement of reasons relied on by the tribunal. *See Wolff v. McDonnell,* 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974).

In contrast, when a prisoner is segregated for administrative reasons, he is entitled to fewer procedural protections. The Supreme Court held in *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1982), that the Constitution does not create a liberty interest to be free from prison administrative segregation, whether the purpose of the segregation is to protect the prisoner's safety, to protect others from that prisoner, to break up potentially disruptive groups of inmates or to await later classification or transfer:

> It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the term of confinement ordinarily contemplated by a prison sentence.... Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.

*Id.* A state, however, may choose to create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures. *Id.* at 469, 103 S.Ct. at 870. The mere adoption by the state of procedural guidelines without more is insufficient to give rise to a protected liberty interest; only "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected

liberty interest." *Id.* at 471–72, 103 S.Ct. at 871.

The Second Circuit has recently held that the New York state law regulatory structure in effect during the relevant time period for this case, which provides for protective segregation, 7 N.Y.C.R.R. § 304.1(b), is sufficiently mandatory in character as to create a protected liberty interest. *Matiyn v. Henderson,* 841 F.2d 31, 36 (2d Cir.1988). But even when the state creates such a protected liberty interest, the inmate confined for administrative reasons is entitled to only minimal process—"some notice of the charges against him and an opportunity to present his view to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 34 (quoting *Hewitt v. Helms, supra,* 459 U.S. at 476, 103 S.Ct. at 874).

The undisputed facts of this case indicate that plaintiff was segregated for administrative purposes rather than as a disciplinary sanction. Throughout his complaint, plaintiff stresses that prison officials placed plaintiff in IPC because of security concerns. While plaintiff disagrees with the judgment of the prison officials, he nowhere claims that the motivation of the prison officials leading to his IPC status was to discipline him.

Considering plaintiff's segregation as an administrative one, the undisputed facts presented by plaintiff in his complaint indicate that plaintiff received all process that was due to him. Because this was not a disciplinary proceeding, plaintiff had no federal constitutional right to have assistance with his defense, to call witnesses, or to have a hearing. Even though an informal, nonadversary evidentiary review would have been sufficient to support plaintiff's administrative confinement, plaintiff's own description of the process he received indicates that he received much more.

 Correction officers Rizzo, Smith, and Kiernan, each discussed the security concerns they had with plaintiff and plaintiff had an opportunity to express his views in each of his conversations with the various officers. Following these discussions,

a written recommendation, constituting notice, was served on plaintiff. In addition, on March 12, 1987, a hearing was held with respect to the IPC recommendation. At that hearing, Stow informed plaintiff of his reasons for authorizing an IPC recommendation and plaintiff was permitted to make a statement for the record. Finally, plaintiff utilized the administrative review procedures available and successfully appealed the adverse hearing determination. Under these circumstances, the Court believes that the minimal process requirement of *Hewitt*—notice of the charges against him and an opportunity to be heard by the official responsible for transferring him— has been satisfied.

 Moreover, even if plaintiff was deprived of a protected liberty interest without due process of law because Stow came into the hearing without an open mind, defendants are entitled to summary judgment on the ground of qualified immunity. In *Matiyn, supra,* at 36, the Second Circuit granted such immunity to officials where they gave no process whatsoever to an inmate placed in IPC. The Court noted that, until the date of the decision, no court had previously interpreted the regulations pertaining to IPC and, thus, the conduct of the officials did not violate clearly established law. *Id.* The events at issue in the instant case occurred nearly a year before *Matiyn* and the officials here could have reasonably interpreted the regulations to reach the conclusion that the type of process they gave to Gomez was all that was required. Thus, even if this Court considers the process that Gomez received (which was much more than Matiyn received) to be so inadequate that it is equivalent to no process at all, defendants here are still entitled to the same protection as the defendants in *Matiyn* as a matter of law. Accordingly, defendants' motion for summary judgment with respect to plaintiff's due process claim is granted.

C. *Transfer to a Maximum Security Facility*

Plaintiff claims that his transfer to a maximum security facility both deprived

him of a protected liberty interest and constituted cruel and unusual punishment. The Court finds that both of these allegations are devoid of merit.

A prisoner has no inherent constitutional right to be housed in a particular institution, *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976), or to enjoy a particular security classification. *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976). The Supreme Court in *Meachum* stated:

> [c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

*Meachum v. Fano, supra*, 427 U.S. at 225, 96 S.Ct. at 2538. The Constitution, therefore, does not require any form of procedural safeguards, such as a hearing, before a prisoner can be transferred from one prison to another. *See Matiyn v. Henderson, supra*, at 34; *McCalvin v. Fairman*, 603 F.Supp. 342, 345 (C.D.Ill. 1985).

■ As noted above, a state, by its own actions, may create liberty interests protected by the Due Process Clause. *Hewitt v. Helms, supra*, 459 U.S. at 469, 103 S.Ct. at 870. New York, however, has declined to create such a liberty interest in that New York law does not place conditions on inter-prison transfers or changes in classification. *See Matiyn v. Henderson, supra*,

at 34; *Sher v. Coughlin, supra*, 739 F.2d at 81.[2]

Plaintiff also asserts the his transfer to a maximum security facility constituted cruel and unusual punishment. Conditions of confinement constitute cruel and unusual punishment when they result "in unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). *See also Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.1985); *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir.1984). Conditions that are restrictive or even harsh are part of the penalty inherent in being convicted of a crime serious enough to result in imprisonment. *Anderson v. Coughlin, supra*, 757 F.2d at 35.

■ It is clear that confinement in a maximum security facility itself does not amount to cruel and unusual punishment. *See Crowe v. Leeke*, 540 F.2d 740, 741 (4th Cir.1976); *Breeden v. Jackson*, 457 F.2d 578 (4th Cir.1972). Moreover, misclassification that results in an inmate being placed in an institution with higher level security "does not itself inflict pain within the meaning of the Eighth Amendment." *Hoptowit v. Ray*, 682 F.2d 1237, 1256 (9th Cir.1982). Accordingly, plaintiff's transfer to a maximum security facility, even if it resulted from plaintiff's improper classification, does not amount to an infliction of cruel or unusual punishment.

Inasmuch as any lack of process with respect to the transfer, and the transfer itself, did not deny plaintiff any constitutional right to which he was entitled, the Court grants defendants' motion for summary judgment on this ground.[3]

---

2. New York Correction Law § 23(1) provides that: The commissioner of correction shall have the power to transfer inmates from one correctional facility to another. The Supreme Court in *Montanye v. Haymes*, 427 U.S. 236, 243 [96 S.Ct. 2543, 2547, 49 L.Ed.2d 466] (1976), specifically stated that the New York statute governing prison transfers "imposes no conditions on the discretionary power to transfer, and we are advised by the State that no such requirements have been promulgated." *See also McBride v. Hallenbeck*, 587 F.Supp. 490, 492 (E.D.N.Y.1984) (transfer from medium to maximum security

facility for punitive or disciplinary purposes does not rise to level of constitutional violation). No statutory or other conditions having any bearing on plaintiff's transfer have since been promulgated. Thus, the discretion that was exercised with respect to plaintiff's transfer was inherent in plaintiff's sentence to the custody of the commissioner and does not state a claim for a constitutional violation.

3. Inasmuch as plaintiff has already been transferred to a medium security facility, albeit not the one of plaintiff's choice, plaintiff's request

## D. *Search and Seizure*

Reading plaintiff's complaint liberally, plaintiff asserts that the strip search he was forced to undergo prior to his placement in IPC violated his fourth amendment right to be protected against unreasonable searches and seizures.[4] Plaintiff's description of the strip search is as follows:

> Upon entry [sic] to the office, several unknown Correctional Officers assigned to Mid–Orange Correctional Facility, bushed [sic] me against the wall, pat frisked my clothing, but then was roughly hand cuffed and was half dragged to the detention area as though committed the greats [sic] crime (discription) [sic] upon where I was forst [sic] to strip my clothing for body cavities search.[5]

In *Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–86, 60 L.Ed.2d 447 (1978), the Supreme Court considered the constitutionality of a prison policy which required all inmates to undergo a strip search and body-cavity search following each contact visit from an individual from outside the institution. While the Court acknowledged that both convicted prisoners and pretrial detainees retain some fourth amendment rights upon commitment to a corrections facility, the Court concluded that strip and body-cavity searches did not violate the fourth amendment because the searches are not unreasonable. *Id.* at 559, 99 S.Ct. at 1884. In reaching this holding, the Court concluded that the searches must be conducted in a reasonable manner, even though the searches could be conducted on less than probable cause. *Id.* at 560, 99 S.Ct. at 1885.

Since *Wolfish*, two lines of cases have emerged. *See Goff v. Nix*, 803 F.2d 358, 370–71 (8th Cir.1986), *cert. denied*, — U.S. ——, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987) (compiling cases). In the first line of cases, courts find that body-cavity searches of prison visitors and pretrial detainees charged with traffic offense or misdemeanors are unreasonable unless "reasonable suspicion" exists. *Id. See Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). The second line of cases involves body-cavity searches of those who already have been convicted and are imprisoned

---

for injunctive relief is denied as moot. The Court also denies plaintiff's request to have the records of his administrative proceeding and subsequent transfer expunged. Initially, it is clear that in light of defendants' strong interest in maintaining adequate records, they cannot delete the entire record of an inmate's incarceration at a particular facility. *See Respress v. Coughlin*, 585 F.Supp. 854, 859 (S.D.N.Y.1984). Moreover, because the due process rights asserted by plaintiff were not clearly established when his hearing was held, there is no reason to expunge from plaintiff's records the administrative proceedings leading up to his transfer. *See McKinnon v. Patterson*, 568 F.2d 930, 935 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The Court notes that plaintiff has given the Court no reason to believe that the reversal of the administrative hearing determination will not be accurately reflected in prison records and, in fact, the Assistant Attorney General has informed the Court that the records relating to plaintiff's involuntary protective custody status have been expunged. Finally, because the Court finds that plaintiff's constitutional rights were not violated, plaintiff's request for damages and declaratory relief is denied.

4. In his second complaint, plaintiff states that "he had been deprived of rights against unrea-

sonable search and seizure, in light of the due process, upon probable cause."

5. As described by plaintiff, it is clear that plaintiff was required to submit to what the DOCS directive defines as a "Strip frisk":

> "Strip frisk" means a search of an inmate's clothes and body including body cavities. For a male this involves one or more of the following procedures: opening his mouth and moving his tongue up and down and from side to side, removing any dentures, running his hands through his hair, allowing his ears to be visually examined, lifting his arms to expose his armpits, spreading his testicles to expose the area behind his testicles, and bending over and/or spreading his buttocks to expose his anus to the frisking officer. For females the procedures are similar except that females must also squat to expose the vagina.

DOCS Directive No. 4910 (II) (K) (4). This is to be distinguished from a "body cavity search," which is an actual physical examination of the inmate's anal and/or genital cavities conducted by a professional member of the Health Services staff. Because the cases describing the behavior of "Strip frisk" frequently refer to the procedure as a body-cavity search, this Court will use the terms interchangeably.

and pretrial detainees charged with felonies. To date, no appellate court decision has found these searches to be unconstitutional. *Goff v. Nix, supra,* 803 F.2d at 370. *But see Hurley v. Ward,* 549 F.Supp. 174 (S.D.N.Y.1982) (routine body-cavity searches are unreasonable in all circumstances other than after contact visits).

As noted by the Second Circuit, the proper inquiry with respect to body-cavity searches within the prison context is whether such searches are reasonable. *Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983). "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* (quoting *Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884).

In *Hodges, supra,* 712 F.2d at 35, an inmate complained that a strip search and an accompanying physical attack prior to his being placed in administrative detention was unconstitutional. Hodges alleged that he had been searched immediately prior to the search forming the basis of his complaint and he therefore questioned the need for a second search. The District Court dismissed the complaint for failure to state a claim. Reversing, the Second Circuit acknowledged that the first search, which was part of the mandatory procedure applicable whenever an inmate is placed in administrative detention, was not challenged by the complaint. *Id.* Rather, at issue was the reasonableness of a second search. Because the second search took place shortly after the first search and the inmate had been under a continuous escort, the Court found that the second search was unnecessary and Hodges had stated separate constitutional claims with respect to both the second search and the assault. *Id.* at 35–36.

■ In the Court's view, plaintiff's complaint, even when liberally read, fails to raise a material issue of fact with respect to the reasonableness of the search. From the undisputed facts as presented by plaintiff, he had been involved in a dispute with another inmate the night before. All the correction officials had expressed concern that physical violence might erupt between the two inmates. At least some of the correction officers were under the impression that weapon threats had occurred. A decision had been made by Sergeant Kiernan, who had been informed of the altercation, to recommend that plaintiff be placed in Involuntary Protective Custody. Under these circumstances, the defendants were following the normal procedure of strip frisking an inmate before the inmate was placed in administrative segregation. *See* DOCS Directive No. 4910 (IV) (D) (2) (c) (5). Inasmuch as the strip search in this case was incidental to placement in Involuntary Protective Custody in an area of heightened security, it was prudent, reasonable and required.

Moreover, plaintiff does not claim that his search was part of an abusive pattern of such searches or that the search itself was accompanied by attempts at humiliation or violence resulting in injury. While the correction officials' behavior prior to conducting the search might have been a little more forceful than necessary under the circumstances, plaintiff's description of events leading up to the body-cavity search does not indicate that the actions of the correction officers were accomplished in a "grossly disproportionate" manner or involved the "unnecessary and wanton infliction of pain," as would be necessary to make out a eighth amendment violation. *See Smith v. Coughlin, supra,* 748 F.2d at 787.

■ At no point does plaintiff describe the actual body-cavity search itself in a way that would lead the Court to believe that significant violence, abuse, or harassment by the officials conducting the search occurred. In the Court's view, an isolated body-cavity search is reasonable when it is not conducted in an abusive fashion and is performed prior to the inmate's placement in administrative segregation pursuant to prison policy.

As noted recently by the Second Circuit: We recognize the need, when the intrusion of strip searches and body cavity searches is reasonably justifiable, to defer to the judgment of prison officials

charged with preserving order and maintaining the security of detention facilities; such deference is sometimes appropriate even if in the judgment of the court less intrusive means to secure the prison and protect the safety of jailers and inmates might have been employed. Deference, however, is not a dispensation from the requirement under the Fourth Amendment that searches be reasonable. *Weber v. Dell, supra,* 804 F.2d at 804.

Inasmuch as the Court finds that the body-cavity search as described by plaintiff was reasonable under the circumstances, the Court grants summary judgment to defendants.[6]

### E. *Double Jeopardy*

█ Plaintiff argues that he was twice put in jeopardy when defendants Kiernan and Stow put him in IPC after Lieutenant Smith and Rizzo had determined that the inmates did not need to be separated. This argument is totally lacking in merit. While correction officers according to DOCS directives are permitted to resolve matters informally when confronted with a minor infraction, this does not mean that they are unable to utilize formal procedures when in their discretion such procedures are necessary.

The double jeopardy clause of the fifth amendment, made applicable to the States by the fourteenth amendment, prohibits both multiple punishments for the same offense and multiple prosecutions for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). "A threshold requirement before the double jeopardy clause can be interposed successfully is that the initial proceeding at issue be the type in which jeopardy can attach." *Lockett v. Montemango,* 784 F.2d 78, 82 (2d Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 120, 93 L.Ed.2d 66 (1986).

In the Court's view, plaintiff's original conversation with Lieutenant Smith did not even rise to the level of a proceeding, much less to the type of proceeding in which jeopardy can attach. *See Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957) ("The constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense."). There was no criminal prosecution, no acquittal, conviction or sentencing, and nothing for jeopardy to attach. The Constitution does not prohibit prison officials from revisiting security concerns and there is no question that their duty to protect the inmates requires it. The Court therefore grants summary judgment for defendants with respect to this claim.

### II. *Slander Claim*

█ Finally, in the absence of a federal claim, the Court finds no basis for exercising pendent jurisdiction over plaintiff's state law slander claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 732 F.2d 38, 42 (2d Cir. 1984). Accordingly, this claim is dismissed without prejudice.

### CONCLUSION

In sum, the Court holds that defendant Coughlin should be dismissed from the suit due to plaintiff's failure to allege personal involvement. Taking all of the facts presented by plaintiff as true, it is clear both that no genuine issue of material fact remains to be resolved at trial and that the remaining defendants are entitled to judgment as a matter of law with respect to plaintiff's section 1983 claim. In its discretion, the Court dismisses plaintiff's slander claim without prejudice.

---

6. Even if the Court had found that plaintiff had established a constitutional violation because the circumstances and manner in which the search had been carried out were unreasonable, defendants would still be entitled to summary judgement. In his complaint, plaintiff states that the search was conducted by unnamed correction officers. Inasmuch as plaintiff has failed to name these officers as defendants in the complaint and failed to raise a material issue of fact with respect to the named defendants' involvement in the search, summary judgement for the named defendants would be appropriate.

**1302**

Accordingly, plaintiff's motion for summary judgment is denied, defendants' motion for summary judgment is granted, and the complaint is dismissed.

It is so ordered.