**Pamela A. SMART, Plaintiff,**

v.

**Glenn GOORD, et al., Defendants.**

**No. 04 CIV. 8850 RWS.**

United States District Court, S.D. New York.

July 27, 2006.

632

Pamela A. Smart, Bedford Hills, NY, for Plaintiff Pro Se.

Honorable Eliot Spitzer, Attorney General of the State of New York, New York, NY (Maria Barous Hartofilis, Assistant Attorney General Of Counsel), for Defendants.

## OPINION

SWEET, District Judge.

Defendants Commissioner Glenn Goord ("Commissioner Goord"), former Superintendent Elaine Lord ("Superintendent Lord"), Director of Special Housing/Inmate Disciplinary Program Donald Selsky ("Director Selsky"), Hearing Officer Jose Pico ("Officer Pico"), former Deputy Superintendent Terence McElroy ("Deputy Superintendent McElroy"), Deputy Superintendent of Health Services Cheree Lemmerman ("Deputy Superintendent Lemmerman"), Associate Director of Operations for Women's Mental Health Services Michelle Petrino ("Director Petrino"), Lieutenant Lawrence Hammond ("Lieutenant Hammond"), Lieutenant D. Fifield ("Lieutenant Fifield"), former Director of the Office of Mental Health ("OMH") Carolyn Subin ("Director Subin"), Correction Counselor Fran Favale ("Counselor Favale"), and Lieutenant B. Smith ("Lieutenant Smith") (collectively, the "Defendants"),[1] have moved pursuant

---

1. Plaintiff's claims against defendant Corrections Officer E. Ford have not been challenged on this motion to dismiss, and will be addressed in a separate opinion.

to Rule 12(b)(6), Fed.R.Civ.P., to dismiss the *pro se* complaint of Pamela A. Smart ("Smart"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"). With the exception of Commissioner Goord and Director Selsky, at all relevant times Defendants were employed at Bedford Hills Correctional Facility ("BHCF"). For the reasons set forth below, the motion is granted in part and denied in part.

## Prior Proceedings

On November 9, 2004 Smart filed her complaint *pro se,* seeking damages and injunctive and declaratory relief under 42 U.S.C. § 1983. The complaint alleged that Defendants denied her medical treatment in violation of the Eight Amendment, denied her meaningful access to the courts and deprived her of liberty without due process of law in violation of the Fourteenth Amendment, and retaliated against her in violation of her rights under the First Amendment.

Defendants filed the instant motion to dismiss on August 5, 2005. Smart filed her opposition on December 14, 2005, and Defendants replied on February 1, 2006, on which date the motion was marked fully submitted.

## The Facts

The following facts are drawn from the allegations contained in the complaint. All well-pleaded allegations are accepted as true for the purposes of this motion. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). The following statements do not constitute findings of the Court.

Smart was placed in the BHCF Special Housing Unit ("SHU") on May 24, 2003. She was informed by representatives of DOCS' Inspector General's ("IG") Office that the placement resulted from the appearance of an article about her published by the National Enquirer in May 2003. The article, which claimed that Smart had seduced prison guards, was accompanied by photographs of her in her cell in bra and underwear.

Smart informed IG investigators that the photographs had been taken in early 2001 by defendant E. Ford, a corrections officer at BHCF who, Smart alleged, had assaulted her, attempted to rape her, and threatened her on multiple occasions.

On May 26, 2003, Smart received a Tier II misbehavior report for possession of contraband in the cell she had occupied before being transferred to the SHU.

On May 27,[2] Smart was informed that she was being held in Involuntary Protective Custody ("IPC") pursuant to a recommendation by Lieutenant Smith. The IPC recommendation stated in part: "Inmate Smart may be at risk from others due to the knowledge or information she has obtained in the process of taking the photos, obtaining a camera, smuggling or receiving contraband. These actions may also make Inmate Smart a potential victim in the presence of other inmates." (Compl.Ex. C.)

On May 30, Smart attended a hearing conducted by Officer Pico to review her placement in IPC. Based on the National Enquirer article and the recommendation of Lieutenant Smith, Officer Pico concluded that continued confinement in IPC was justified.

On June 2, Smart was present at a disciplinary hearing conducted by Lieutenant Fifield in connection with the misbehavior report regarding contraband in her cell. Lieutenant Fifield imposed the maximum penalty available, including thirty days' keeplock and thirty days' loss of packages, commissary, and phone privi-

---

**2.** This and all subsequent dates refer to 2003 unless otherwise noted.

leges. Smart appealed this disposition to Superintendent Lord.

Smart told a BHCF nurse and Deputy Superintendent Lemmerman on June 19 that she was experiencing pain in her right leg and sacrum, and requested to see a doctor to increase her pain medication.

Smart filed a grievance on June 20, requesting that she be released from IPC. Also on June 20, Smart received notification that Superintendent Lord had denied her appeal of the June 2 disciplinary hearing.

On June 24, Smart appealed the result of her May 30 IPC hearing directly to Director Selsky.

On June 26, Smart attended a thirty-day review of her IPC status held by the SHU Case Management Committee. Deputy Superintendent McElroy, Deputy Superintendent Lemmerman, Director Petrino, Lieutenant Hammond, and Counselor Favale were all in attendance. Smart again told Deputy Superintendent Lemmerman that she was experiencing pain in her right leg and sacrum, and complained that a scheduled cortisone shot had not been administered. Deputy Superintendent Lemmerman indicated that Smart could not be taken outside the facility for the cortisone shot due to security concerns, and that the shot would be administered when the doctor could come to BHCF. When Smart argued for her release from IPC, Deputy Superintendent McElroy said that the committee was "not there to hear her case," only "to see how she was adjusting," and that her case would be heard on her appeal. (Compl.¶ 44.)

On July 8, Smart's grievance of her IPC confinement was denied by Superintendent Lord. The following day she received notice that the SHU Case Management Committee had recommended continued confinement in IPC, and that Superintendent Lord had approved the recommendation.

On July 24, Smart attended her second thirty-day IPC status hearing, which was also attended by Superintendent Lord, Deputy Superintendent McElroy, Deputy Superintendent Lemmerman, Director Subin, Lieutenant Hammond, and Counselor Favale. The SHU Case Management Committee recommended on July 29 that Smart should remain in IPC, and Superintendent Lord again approved the recommendation.

On August 1, however, the same Case Management Committee reversed its decision and recommended that Smart be released from IPC. Superintendent Lord approved Smart's release. The committee explained that the IG investigation regarding the National Enquirer article was nearing completion and that it had "not revealed any new information which would warrant continued I.P.C. status for this inmate." (Compl.Ex.MM.) Smart alleges that the actual reason for her release was the political pressure DOCS was receiving from inmates' rights groups and others, including U.S. Senator John Sununu. (Compl.¶ 72.) Whatever the reason, Smart was released from IPC and returned to the general population that same day, having spent seventy days in segregated confinement.

On August 8, Director Selsky reversed Smart's initial May 30 IPC hearing, noting that "The [IPC] recommendation does not support assignment to involuntary protective custody." (Compl.Ex.OO.) Selsky ordered that all records making reference to the IPC hearing be expunged.

In the week following her release from IPC, Smart was moved to three different cells. She was not allowed to resume work at the prison jobs she had held before her placement in IPC.

Smart received a cortisone shot on August 13.

The complaint alleged that Smart's placement in IPC was precipitated by De-

fendants in retaliation for reporting staff misconduct. (Compl. ¶ 94.) Smart has claimed that Defendants deprived her of her liberty without due process because there was no evidence to substantiate her initial IPC confinement (*id.* ¶ 92), and that Defendants' failure to recommend her release from IPC at her thirty-day hearings constituted a further violation of her due process rights (*id.* ¶ 93). Furthermore, she has alleged that she should not have received a misbehavior report for possessing contraband, that she should not have been found guilty at her Tier II hearing, and that her Tier II appeal should have been granted. (Id. ¶¶ 97–99.) She also has alleged that she was denied meaningful access to the courts because of substandard law library access and assistance. (*Id.* ¶ 91.) According to Smart, the decision to move her to three different housing units and the decision to prohibit her from returning to her prison jobs were both in retaliation for her reporting staff misconduct. (*Id.* ¶¶ 95, 96.) She has alleged that her Eighth Amendment rights were violated when Superintendent Lemmerman delayed her receiving a cortisone shot. (*Id.* at ¶ 88.) Moreover, Smart has alleged that she was threatened, assaulted, and harassed by Correction Officer Ford prior to February 2001, when he allegedly took the photographs of her which ended up in the National Enquirer (*id.* ¶¶ 85–86), and that the failure of Defendants Goord, Lord, and McElroy to protect her from Ford's actions constitutes a violation of her Eighth Amendment rights.

## Discussion

### I. The Appropriate Standard For A 12(b)(6) Motion To Dismiss

In reviewing a complaint for legal sufficiency under Rule 12(b)(6), Fed.R.Civ.P., the Court takes the material factual allegations as true and draws all reasonable inferences in favor of plaintiff, dismissing it only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Because Smart is a *pro se* plaintiff, her complaint should be liberally construed in her favor. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

■ The Court may consider outside documents that are integral to the complaint, regardless whether attached to the complaint, so long as the pleader has notice of them or refers to them. *See Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001); *Schnall v. Marine Midland Bank,* 225 F.3d 263, 266 (2d Cir.2000). "[W]hile courts generally do not consider matters outside the pleadings, they may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a 12(b)(6) motion. The records of state administrative proceedings may be considered." *Garcia v. Lewis,* No. 05 Civ. 1153(SAS), 2005 WL 1423253, *3, 2005 U.S. Dist. LEXIS 11955, at *10 (S.D.N.Y. June 16, 2005). When ruling on a motion to dismiss, the Court may take judicial notice of records and reports of administrative bodies, items in the record of the case, matters of general public record, and copies of documents attached to the complaint. *Calcutti v. SBU, Inc.,* 224 F.Supp.2d 691, 696 (S.D.N.Y.2002).

■ As exhaustion of administrative remedies is a prerequisite to bringing suit, an inmate plaintiff necessarily refers to and relies on documents exhibiting proof of exhaustion. Because the exhaustion issue is an integral part of a prisoner's claim, the Court may refer to materials outside of the complaint on a 12(b)(6) motion in determining whether a plaintiff exhausted. *See Abney v. McGinnis,* No. 01 Civ.

8444(SAS), 2002 WL 1461491, **3–4, 2002 U.S. Dist. LEXIS 12180, at *6–*7 (S.D.N.Y July 2, 2002), *reversed and vacated on other grounds,* 380 F.3d 663 (2d Cir.2004); *Martinez v. Williams,* 186 F.Supp.2d 353, 355 (S.D.N.Y.2002).

## II. Claims Not Exhausted Are Dismissed

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

■ Failure to exhaust is an absolute bar to an inmate's action in federal court: "1997e(a) requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001). Because the plain language of 1997e(a) states "no action shall be brought," the inmate must have exhausted his claims at the time the initial complaint was filed. "Subsequent exhaustion after suit is filed therefore is insufficient." *Id.;*

*see also Salahuddin v. Mead,* 174 F.3d 271, 274–75 (2d Cir.1999).

■ In order for an inmate to exhaust her claim for purposes of § 1997e(a), she must file a grievance and appeal that grievance through all three levels of the grievance procedure. "[E]ven if a plaintiff files a valid grievance, he must still exhaust all appeals before filing suit." *Moulier v. Forte,* No. 02 Civ. 2148(JSM), 2003 WL 21272064, *1, 2003 U.S. Dist. LEXIS 9082, at *2 (S.D.N.Y. May 29, 2003). The inmate's claim thus is not exhausted until she appeals to and receives a final decision regarding her grievance from the DOCS Central Office Review Committee ("CORC") in Albany. *Wilson v. Keane,* No. 02 CIV. 5256(DLC), 2003 WL 22132865, *1, 2003 U.S. Dist. LEXIS 16113, at *1–*2 (S.D.N.Y. Sept. 16, 2003); *Mendez v. Artuz,* No. 01 Civ. 4157(GEL), 2002 WL 313796, *2, 2002 U.S. Dist. LEXIS 3263, at *4–*5 (S.D.N.Y. Feb. 26, 2002).

■ An inmate's grievance must contain the kind of information that prison administrators require in order to adequately investigate the claims ultimately brought to court. *See Luckerson v. Goord,* No. 00 Civ. 9508(JSR), 2002 WL 1628550. *2, 2002 U.S. Dist. LEXIS 13297, at *5 (S.D.N.Y. July 22, 2002) (holding that grievance requesting only air testing does not put DOCS on notice of claims for deliberate indifference in treating exposure to asbestos). *See also Strong v. David,* 297 F.3d 646, 649 (7th Cir.2002). Allowing an inmate plaintiff to proceed with issues that DOCS officials "had no reason to address" in responding to a grievance "would make a mockery of the exhaustion requirement." *Luckerson,* 2002 WL 1628550, *2, 2002 U.S. Dist. LEXIS 13297, at *5.[3]

---

**3.** Another benefit of exhaustion is that it allows for the creation of an administrative record which "clarifies the contours of the controversy" should the matter ultimately go to court. *Porter,* 534 U.S. at 525, 122 S.Ct.

983. This benefit would be lost if plaintiffs were allowed to identify problems in court which could have been, but were not, identified in grievances.

■ In this case, Smart has not exhausted any grievance regarding her claims of retaliation, failure to protect, denial of access to the courts, and deliberate indifference to her serious medical needs. These claims clearly fall within the exhaustion requirement. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The governmental records maintained by DOCS establish that Smart never appealed to CORC any grievance regarding the foregoing claims raised in her complaint before this action was commenced. *See* Eagen Decl. ¶¶ 3–4 & Ex. A.

■ Smart did file and appeal grievances regarding her placement in IPC and the imposition of disciplinary measures following her Tier II hearing. *See* Grievances No. BH–13342–03, No. BH–13331–03. However, the filing and exhaustion of a grievance does not grant plaintiff leave to sue "anyone who was in any way connected with the events giving rise to that grievance. The Court must examine whether plaintiff's grievance sufficiently alerted prison authorities that [she] was alleging some wrongdoing beyond [the facts specifically described in the grievance]." *Turner v. Goord,* 376 F.Supp.2d 321, 324–25 (W.D.N.Y.2005). Smart's grievances did not address the facts underlying her claims of deliberate indifference, denial of access to the courts, or failure to protect. Furthermore, her grievances did not make any allegation of retaliation in violation of her rights under the First Amendment, nor did they address many of the facts that form the basis for this claim (i.e., being moved frequently from cell to cell and the loss of prison jobs).

Accordingly, Smart's claims of retaliation, failure to protect, deliberate indifference to serious medical needs, and denial of access to the courts are dismissed for failure to exhaust pursuant to 42 U.S.C. § 1997e (a).

### III. The Motion To Dismiss The Due Process Claims Is Granted in Part and Denied in Part

Smart has alleged that Defendants deprived her of liberty without due process on several occasions. Specifically, she has alleged violations of her due process rights by (1) Defendants Goord, Lord, Smith, Pico, and Selsky in connection with her initial and continued confinement in IPC; (2) Defendants McElroy, Lemmerman, Petrino, Subin, Hammond, and Favale in failing to recommend her release from IPC at her thirty-day hearings; (3) Defendant Fifield in imposing disciplinary sanctions at her Tier II disciplinary hearing; and (4) Defendant Lord in denying Smart's Tier II appeal.

The Due Process Clause of the Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. As the Second Circuit has stated, the threshold questions in a § 1983 claim for denial of due process are (1) whether a plaintiff possessed a liberty interest protected by the Constitution and (2) whether defendants deprived plaintiff of that liberty interest as a result of insufficient process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995).

■ Although "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen … a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). An inmate's liberty interests may be derived either directly from the Due Process Clause or from state statutes and regulations. *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The Su-

preme Court has narrowly limited the scope of the Due Process Clause to protect no more than the "the most basic liberty interests in prisoners." *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen."). "Generally, prison inmates have no liberty interest in remaining within the general prison population, and out of administrative segregation, unless the state has chosen to create such an interest by enacting certain statutory or regulatory measures." *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.1988).

To determine whether state law confers upon inmates a liberty interest in remaining free from confinement or restraint, federal courts apply a two-part test. First, the confinement or restraint at issue must create an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Second, "the state [must have] granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

### A. The Due Process Claims Arising from Smart's Tier II Hearing Are Dismissed

As a result of the Tier II hearing on June 2, 2003, Smart received thirty days' keeplock and thirty days' loss of packages, commissary, and phone privileges. As a number of district courts have noted, "the decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.*" *Williams v. Keane,* No. 95 Civ.

0379(AJP)(JGK), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997) (citing cases). Likewise, the loss of phone, package, and commissary privileges does not give rise to a protected liberty interest under New York law. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Because Smart does not allege that she was deprived of a protected liberty interest as a result of her Tier II hearing and subsequent appeal, the related due process claims against Defendants Fifield and Lord must be dismissed.

### B. The Due Process Claims Arising From Smart's Confinement In IPC Can Go Forward

Smart's remaining due process claims arise from her placement in segregated confinement in SHU/IPC for a period of seventy days. Because Smart adequately has alleged that she was deprived of a protected liberty interest through insufficient process of law, these claims cannot be dismissed in their entirety.

### 1. Smart Adequately Has Alleged The Deprivation Of A Protected Liberty Interest

As noted above, to state a claim for the denial of due process, Smart first must allege that she has been deprived of a liberty interest protected by state law, *Frazier,* 81 F.3d at 317. The Second Circuit repeatedly has held that New York law grants inmates a protected interest in remaining free from segregated confinement. *Green,* 46 F.3d at 194; *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("It is undisputed ... that New York state law 'create[s] a liberty interest in not being confined to the SHU.'") (quoting *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999)). Whether Smart's seventy-day confinement constitutes an "atypical

and significant hardship" within the meaning of *Sandin* presents a closer question, but Smart's allegations in this regard are sufficient to withstand a motion to dismiss.

Courts in the Second Circuit look to both the duration and conditions of confinement in determining whether segregated confinement constitutes an atypical and significant hardship. As one district court has noted, the inquiry is "whether the duration of plaintiff's actual period of administrative or disciplinary confinement and the conditions thereof are so different from conditions manifest in both the general population of the prison and other segregative housing as to give rise to a liberty interest." *Giano v. Selsky,* 37 F.Supp.2d 162, 168 (N.D.N.Y.1999).

In general, confinement of fewer than 101 days will not constitute an atypical and significant hardship unless "the conditions were more severe than ... normal SHU conditions [or the record shows] that even relatively brief confinements under normal SHU conditions were in fact, atypical." *Palmer,* 364 F.3d at 65. Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions, nor has she made any allegations regarding the frequency of similar terms of confinement. However, such detailed factual allegations are not necessary to withstand a motion to dismiss:

> In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions.

*Id.* Since Smart has alleged that she was confined for seventy days, she has met her burden in alleging the deprivation of a protected liberty interest.

### 2. *Smart Adequately Has Alleged Insufficient Process*

■■■ Defendants contend that whether or not Smart sufficiently has alleged a liberty interest in remaining free from confinement in IPC, her complaint should be dismissed for failure to allege that she was deprived of her liberty due to insufficient process. However, when liberally construed—as they should be, *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)—Smart's complaint and accompanying documents contain allegations of insufficient process that withstand a motion to dismiss.

The Supreme Court has noted that the "requirements imposed by the [Due Process] Clause are, of course, flexible and variant dependent upon the particular situation being examined." *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In the prison context, segregation for disciplinary reasons requires certain procedural protections, including:

> twenty four hours' advance written notice of the charges against him; a right to call witnesses and present documentary evidence in defense, unless doing so would jeopardize institutional safety or correctional goals; the aid of a staff member or inmate in presenting a defense, provided the inmate is illiterate or the issues are complex; and a written statement of reasons relied on by the tribunal.

*Gomez v. Coughlin* 685 F.Supp. 1291, 1296 (S.D.N.Y.1988). In contrast, confinement in administrative segregation requires only an informal, nonadversary review. *Hewitt,* 459 U.S. at 476, 103 S.Ct. 864.

Defendants contend that Smart received "all the process she was due" (Def.'s Reply Mem. at 9) because she was afforded notice, assistance before her initial superintendent's hearing, the right to call wit-

nesses, and the right to present her views, consistent with state regulations set forth at 7 N.Y.C.R.R. §§ 330.3, 254.1–254.6.

Smart does not appear to contest Defendants' facial compliance with the regulatory requirements. Instead, she argues that the procedural protections afforded her were without any substance; nothing but "hollow formality." (Compl. ¶ 10, at 5.) Smart alleges that at her first IPC review hearing, Deputy Superintendent McElroy stated that the committee was "not there to hear her case," only "to see how [she was] adjusting," and that review of the merits of her case would be limited to her appeal. (Compl. ¶ 44, at 10.) Smart also alleges that Superintendent Lord stated at the second IPC review hearing that she "would not be releasing" Smart from IPC, rendering the review hearing moot. (Compl. ¶ 68, at 12.) Furthermore, Smart has alleged that she was confined in SHU/IPC as punishment for the embarrassment her case had caused DOCS, rather than out of any genuine concern for her safety or institutional security. (*See, e.g.,* Def.'s Reply Mem., Ex. A, at 28:20–22.)

█ As another district court in this Circuit noted in *Giano v. Kelly,* 869 F.Supp. 143 (W.D.N.Y.1994), with respect to procedural protections in administrative segregation cases, even "a facially adequate procedure can fail to afford due process if it is not 'granted at a meaningful time and in a meaningful manner.'" *Id.* at 151 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). Smart's allegations raise the possibility that she was confined in IPC without meaningful review or sufficient process, and thus she has met her burden on this issue on the motion to dismiss.

### C. Smart Has Not Alleged Personal Involvement Of All Defendants

█ Defendants next contend that Smart's claims must be dismissed because she has not adequately alleged the personal involvement of Defendants in any violation of her due process rights. Under § 1983, liability can only be imposed for "conduct which subjects or causes to be subjected the complainant to a deprivation of a right secured by the Constitution," *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and a plaintiff must therefore allege the personal involvement of a defendant in the unconstitutional conduct. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

Although "the general doctrine of respondeat superior does not suffice," *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir. 1973), the personal involvement of supervisory officials may be demonstrated in several ways:

> The defendant may have directly participated in the infraction.... A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong.... A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event....

*Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Supervisory liability also may be imposed in cases of "deliberate indifference to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501 (internal quotations omitted).

### 1. Defendants Goord and Selsky

█ Defendants claim that neither Commissioner Goord nor Director Selsky was personally involved in any due process

violation relating to Smart's confinement in IPC. They correctly state that Commissioner Goord cannot be held liable on the sole basis that he did not act in response to letters of protest sent by Smart on July 12 and July 20, 2003. *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."). Defendants are also correct that the mere fact that Director Selsky heard (and granted) the appeal from the determination to place Smart in IPC does not create liability for any due process violations.

Nonetheless, Smart's complaint may also be construed to allege that Goord, Selsky, or both were personally involved in ordering her confinement in IPC. (*See* Compl. ¶ 92.) This is a reasonable reading of the Complaint in the context of some evidence that the decision to place Smart in IPC was made at the highest levels of DOCS (*See* Def.'s Reply Mem., Ex. A, at 42:16–24, 81:3–6.) These claims of the direct participation of Goord and Selsky in Smart's confinement are sufficient to allege these Defendants' personal involvement in the alleged due process violations.

### 2. Defendants McElroy, Lemmerman, Petrino, Subin, Hammond, Lemmerman, And Favale

■ Defendants contend that because the final determination whether to continue an inmate on IPC status is made by the superintendent rather than the committee, *see* 7 N.Y.C.R.R. § 330.3(b)(2), committee members have no personal involvement in any due process violation resulting from that decision. At least one district court in the Second Circuit has so concluded. *Edmonson v. Coughlin*, 21 F.Supp.2d 242, 256 (W.D.N.Y.1998) ("The [review commit-

tee] is not authorized to release an inmate from [administrative segregation], or to order his continued confinement. Its only authority is make a recommendation to the superintendent. [Committee] members, therefore, did not have personal involvement in [Plaintiff's] confinement."). However, another court noted that a committee member could be found personally involved, and thus liable, where he exercised "de facto power" over a plaintiff's continued confinement. *Giano v. Kelly*, No. 89–CV–727(C), 2000 WL 876855, at *23 (W.D.N.Y. May 16, 2000).

Defendants McElroy, Lemmerman, Petrino, Subin, Hammond, Lemmerman, and Favale were each present for at least one of Smart's IPC review hearings. At both hearings, the review committee recommended Smart's continued confinement. Smart has not alleged that any member of the review committee exercised de facto power over her continued confinement. In fact, she has alleged the opposite, that Superintendent Lord's statements that Smart would not be released from IPC "rendered the committee's ability to make an independent assessment a moot point and reduced the review to a hollow formality." (Compl. ¶ 68, at 12.) Accordingly, Smart's due process claims against Defendants McElroy, Lemmerman, Petrino, Subin, Hammond, Lemmerman, and Favale must be dismissed.

### 3. Defendant Lord

■ Defendants appear to contend that Smart has failed to allege the personal involvement of Superintendent Lord. As discussed above, state regulations place the ultimate authority to determine an inmate's continued IPC status in the hands of the facility superintendent. *See* 7 N.Y.C.R.R. § 330.3(b)(2). The courts in this Circuit that have considered the issue have concluded that a superintendent "cannot unilaterally relieve [herself] of [her]

obligation under the DOCS regulations to decide whether to release" an IPC inmate. *Giano*, 2000 WL 876855, at *23; *see also Edmonson*, 21 F.Supp.2d at 256. By alleging Superintendent Lord's failure to release her from IPC, Smart has alleged Lord's personal involvement in the violation of her due process rights.

#### 4. Defendant Smith

 Smart's sole contention regarding Lieutenant Smith's role in any due process violation is that he wrote the IPC recommendation. (Compl.¶ 8.) The mere filing of a report, even if based on unfounded charges, does "not give rise to a per se constitutional violation actionable under section 1983." *Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir.1986). Furthermore, because Smart's IPC status had to be determined through the superintendent's hearing process, Defendant Smith had no authority to order Plaintiff's release or continued confinement, and thus cannot be found personally involved in that determination. *See Edmonson*, 21 F.Supp.2d at 256. Smart's claim against Defendant Smith therefore must be dismissed.

#### 5. Defendant Pico

 Just as Superintendent Lord was ultimately responsible for the determination whether to release or continue to confine Smart at her thirty-day IPC reviews, Officer Pico was responsible for the initial determination that Smart should continue to be held in IPC. *See* 7 N.Y.C.R.R. § 330.3(b)(1). Accordingly, Smart adequately has alleged his personal involvement in any violation of her due process rights.

#### D. Defendants Personally Involved In The IPC Determination Have Not Established Qualified Immunity

As a result of the foregoing discussion, the only surviving claims against the moving Defendants are Plaintiff's due process claims against Commissioner Goord, Director Selsky, Superintendent Lord, and Officer Pico arising from Smart's confinement in IPC. Defendants contend that these remaining claims must also be dismissed because Defendants Goord, Selsky, Lord, and Pico are all entitled to qualified immunity.

"The doctrine of qualified immunity protects state actors sued in their individual capacity from suits for monetary damages where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Baskerville v. Blot*, 224 F.Supp.2d 723, 737 (S.D.N.Y.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Therefore, state officials are shielded by qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir.2001) (quoting *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.1996)).

"A party endeavoring to defeat a lawsuit by a motion to dismiss for failure to state a claim faces a higher burden than a party proceeding on a motion for summary judgment." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir.2004). As with any other motion to dismiss, the defendant must demonstrate that it is "beyond doubt that the plaintiff can prove no set of facts in support of [her] claims which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "While the use of an objective reasonableness standard permits qualified immunity claims to be decided as a matter of law, the determination usually depends on the facts of the case … making dismissal at the pleading stage inappropri-

ate." *McKenna v. Wright,* No. 01 Civ. 6571(HB), 2004 WL 102752, at *7 (S.D.N.Y. Jan.21, 2004).

Whether Defendants' actions violated clearly established law is a question that cannot be resolved without further development of the factual record. The Second Circuit has repeatedly noted that confinements of similar duration to that at issue here "could constitute atypical and significant hardships [and thus violations of clearly established law] if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz v. McBride,* 323 F.3d 191, 195 & n. 1 (2d Cir.2003); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 232 n. 5 (2d Cir.2000)). Defendants have made no showing with regard to either the conditions of Smart's confinement or the extent to which confinements of similar duration may or may not be typical at BHCF or DOCS facilities in general.

 Nevertheless, Defendants contend that they are entitled to qualified immunity because the appearance of the National Enquirer article raised serious concerns about Smart's personal safety and the security of the facility that made it objectively reasonable for Defendants to believe that Smart's confinement did not violate clearly established law. As Defendants concede, concerns for the safety and security of the facility do not support confinement in IPC status, (Def.'s Reply Mem., at 19), and are not mentioned in the regulations governing IPC admission and confinement. *Compare* 7 N.Y.C.R.R. § 330.2 (protective custody inmates) *with* 7 N.Y.C.R.R. § 301.4 (administrative segregation for security reasons). Thus, security concerns cannot support a finding that

Defendants' actions were objectively reasonable.

Defendants also have not demonstrated that concerns for Smart's safety made their actions objectively reasonable. Aside from conclusory statements that Smart's confinement "was necessary for her safety due to the knowledge and information she may have obtained in the process of taking the pictures," Defendants have made no showing that there was any reason to fear for Smart's personal safety. Director Selsky himself concluded on August 8, 2003 that the information available to Defendants did "not support assignment to involuntary protective custody." Compl. Ex. OO.

Smart has alleged that she was placed in segregated confinement as punishment for the embarrassment her case had caused DOCS, rather than out of any genuine concern for her safety or institutional security, and that the procedural protections afforded her were without any substance; nothing but "hollow formality." Because Defendants Goord, Selsky, Lord, and Pico have not demonstrated that their actions did not violate clearly established law, or that it was objectively reasonable for them to believe that their actions did not violate the law, the Court cannot conclude at this stage that they are entitled to qualified immunity.

### Conclusion

For the reasons stated above, Defendants' motion to dismiss for failure to state a claim is granted in part and denied in part. All claims against Defendants McElroy, Lemmerman, Petrino, Hammond, Fifield, Subin, Favale, and Smith are hereby dismissed. All claims against Defendants Goord, Selsky, Lord, and Pico also are hereby dismissed, with the exception of

Plaintiff's due process claims arising from her confinement in IPC.

It is so ordered.